UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

| | |
|---|---|
| MUNICIPAL COMMUNICATIONS III, LLC,<br><br>       Plaintiff,<br><br>v.<br><br>COLUMBUS, GEORGIA; MAYOR of<br>Columbus, Georgia; and COUNCIL<br>MEMBERS of Columbus, Georgia,<br><br>       Defendants | CIVIL ACTION<br><br>FILE NO._____ |

## COMPLAINT

Plaintiff, Municipal Communications III, LLC ("Municipal"), files this Complaint against Defendants, Columbus, Georgia ("Columbus"), and its Mayor and Council Members.

### Introduction

1.      This case involves claims under the Federal Telecommunications Act of 1996 (the "Telecommunications Act," or the "TCA"), 47 U.S.C. § 332(c)(7), arising out of Columbus's denial of requests to place wireless antennas and a concealed support structure on property in Columbus, Georgia.

2.      T-Mobile, an FCC-licensed wireless-service provider, identified a significant gap in its wireless coverage in the area near Interstate 185 and Edgewood Road.  Municipal, which acquires property rights and builds towers and support structures for FCC-licensed wireless carriers, applied to Columbus for the zoning approvals required to place a concealed support structure and antennas on the one suitable and available property that would allow T-Mobile to close its significant coverage gap.  Municipal and T-Mobile demonstrated the need for the tower and antenna facility and satisfied all requirements of Columbus's Unified Development

Ordinance to obtain the requested zoning approvals.  Nevertheless, Defendants refused to grant the requested approvals.

3.      The Telecommunications Act imposes certain requirements on local-government regulation of wireless facilities.  Defendants violated those requirements.  Defendants' decision was not in writing and was not supported by substantial evidence, as required under 47 U.S.C. § 332(c)(7)(B)(iii) (Count One).  Defendants' failure to act on one of Municipal's requests, if it did not constitute a denial, constituted a failure to act within a reasonable period of time in violation of 47 U.S.C. § 332(c)(7)(B)(ii) (Count Two).  Defendants' actions prohibit or have the effect of prohibiting the provision of wireless services in violation of 47 U.S.C. § 332(c)(7)(B)(i)(II) (Count Three).  Defendants' actions unreasonably discriminated among providers of functionally equivalent services in violation of 47 U.S.C. § 332(c)(7)(B)(i)(I) (Count Four).  And Defendants' actions violate Municipal's constitutional due-process and equal-protection rights (Counts Five and Six).

4.      The Telecommunications Act gives the United States district courts the power to remedy violations by local governments and directs district courts to hear and decide actions under the Telecommunications Act on an expedited basis.  47 U.S.C. § 332(c)(7)(B)(v).  In this case, Municipal seeks injunctive relief requiring Defendants to issue the requested approvals and allow Municipal and T-Mobile to build their proposed support structure and antenna facility.

**Parties, Jurisdiction, and Venue**

5.      Municipal Communications III, LLC is a Delaware limited liability company authorized to transact business in Georgia.

6.      Columbus is a consolidated government and public corporation chartered by the General Assembly.  It is a political subdivision of the State of Georgia and is subject to the

jurisdiction of this Court.  It may be served with process by serving its Mayor, B.H. Henderson III.

7.     The Mayor of Columbus is a resident and domiciliary of the Middle District of Georgia, is a public officer acting in his official capacity, is designated here by his official title in accordance with Federal Rule of Civil Procedure 17(d), and is subject to the jurisdiction of this Court.  The Mayor may be served with process by serving the current Mayor, B.H. Henderson III.

8.     The Members of the Columbus Council are residents and domiciliaries of the Middle District of Georgia, are public officers acting in their official capacities, are designated here by their official titles in accordance with Federal Rule of Civil Procedure 17(d), and are subject to the jurisdiction of this Court.  The Council Members may be served with process by serving the current Council Members, Jerry Barnes (District 1), Glenn Davis (District 2), Bruce Huff (District 3), Toyia Tucker (District 4), Charmaine Crabb (District 5), Gary Allen (District 6), Evelyn Woodson (District 7), Walker Garrett (District 8), Judy Thomas (District 9), and John House (District 10).

9.     This Court has subject-matter jurisdiction over the claims in this case under 28 U.S.C. § 1331 and 47 U.S.C. § 332(c).

10.    Venue is proper in this Court under 47 U.S.C. § 332(c), 28 U.S.C. § 1391, 28 U.S.C. § 90(a)(2), and Local Rule 3.4 because Defendants reside, the proposed tower would be located in, and the relevant acts and omissions occurred in this judicial district and division.

**T-Mobile's Wireless Network**

11.    T-Mobile is an FCC-licensed wireless-telecommunications-service provider serving customers throughout the country, including in Columbus.  Like other wireless-service

3

providers, T-Mobile must have a network of antenna facilities to provide effective wireless service to its customers, with each antenna facility serving an immediately surrounding geographic area commonly called a "cell."  Each antenna facility must be placed near the center of its cell so its signal can reach the entire cell and so it can properly interact with neighboring antenna facilities in neighboring cells, picking up and handing off communications and data between antenna facilities as customers travel through the service area.

12.     Although T-Mobile already has 37 operating antenna facilities in Columbus, T-Mobile's radiofrequency engineers identified a significant gap in coverage in the areas along Interstate 185 near Edgewood Road and determined that a new antenna facility was needed to remedy that coverage gap.  T-Mobile identified a search ring where its new antenna facility should be located to interact properly with its existing adjacent antenna facilities.

13.     T-Mobile first looked for existing towers or other structures within a one-mile radius where it might collocate its new antenna facility without the need to build a new tower or support structure.  T-Mobile found existing structures, but T-Mobile's radiofrequency engineers determined that none of them would allow T-Mobile's antennas to remedy the existing coverage gap and interact properly with adjacent antenna facilities.

14.     T-Mobile then considered properties within the search ring where a new tower and antenna facility might be built.  All of the properties in the search ring are zoned and used for single-family-residential purposes except three:  Columbus Country Club, Clubview Elementary School, and Richards Middle School.  None of the owners of those properties was willing to allow an antenna facility and support structure on its property.

15.     Finding no suitable properties within the initial search ring, T-Mobile looked for properties outside the search ring but still close enough to meet its coverage objectives and

interact properly with its existing network.  It found one:  a 3.16-acre property east of Interstate 185 and south of Edgewood Road used by the Columbus-Fort Benning Shrine Club (the "Property").

## The Property

16.     The Property is located at 3202 Edgewood Road, Columbus, Muscogee County, Georgia.  It is bounded by Edgewood Road on the north, East Lindsay Drive on the west, and Hatcher Drive on the east.  The Property is generally triangular in shape, having a long northern frontage along Edgewood Road and then tapering in width moving south.

17.     The Property is owned by Coumbus-Fort Benning Shrine Club Holdings Co. Inc. (the "Property Owner") and is developed and used as the Columbus-Fort Benning Shrine Club's event facility.  The event facility itself sits near the back (south) of the property, and a large surface parking lot sits between the building and Edgewood Road.  Crucially for T-Mobile's purposes, the Property is on Edgewood Road and sits just a few hundred feet from Interstate 185.

18.     T-Mobile's radiofrequency engineers determined that an antenna facility at the Property would be a suitable distance from, and suitably situated between, T-Mobile's five adjacent antenna facilities, allowing the existing antennas and new antennas at the Property to interact properly within T-Mobile's network.  T-Mobile's radiofrequency engineers also conducted computer modeling accounting for the topography of the surrounding area and the location and heights of T-Mobile's existing antenna facilities and determined that an antenna facility at the Property would allow T-Mobile to remedy its significant gap in coverage in this area.

19.     Municipal acquires property rights and builds towers and concealed support structures for wireless carriers.  Through its predecessor-in-interest, Municipal had previously

secured rights from the Property Owner to place a tower and antenna facility on the Property, and Municipal still held those rights in 2021.  Accordingly, T-Mobile asked Municipal to obtain governmental approvals and build a support structure on the Property for T-Mobile's antenna facility.

### The Federal Telecommunications Act

20.     The Federal Telecommunications Act of 1996 establishes the regulatory framework for the placement of wireless service facilities.  In the TCA, Congress adopted a compromise between the desire for local-governmental control over land-use matters, on the one hand, and the need to ensure the fair and rapid deployment of FCC-licensed wireless services, on the other.  That compromise, codified at 47 U.S.C. § 332(c)(7), leaves regulatory authority in the hands of state and local governments, subject to certain federal limitations and requirements.

21.     47 U.S.C. § 332(c)(7)(A) states that, "*Except as provided in this paragraph,* nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities."  (Emphasis added.)

22.     The limitations and requirements are stated in 47 U.S.C. § 332(c)(7)(B).  There are five of them.

23.     First, 47 U.S.C. § 332(c)(7)(B)(i)(I) states that "The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof ... shall not unreasonably discriminate among providers of functionally equivalent services ...."

24.     Second, 47 U.S.C. § 332(c)(7)(B)(i)(II) states that "The regulation of the placement, construction, and modification of personal wireless service facilities by any State or

local government or instrumentality thereof ... shall not prohibit or have the effect of prohibiting the provision of personal wireless services."

25.     Third, 47 U.S.C. § 332(c)(7)(B)(ii) provides that "A State or local government or instrumentality thereof shall act on any request for authorization to place, construct, or modify personal wireless service facilities within a reasonable period of time after the request is duly filed with such government or instrumentality, taking into account the nature and scope of such request."

26.     Fourth, 47 U.S.C. § 332(c)(7)(B)(iii) provides that "Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record."

27.     And fifth, 47 U.S.C. § 332(c)(7)(B)(iv) states that "No State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions."

28.     The TCA also provides a remedy.  Under 47 U.S.C. § 332(c)(7)(B)(v), "Any person adversely affected by any final action or failure to act by a State or local government or any instrumentality thereof that is inconsistent with this subparagraph may, within 30 days after such action or failure to act, commence an action in any court of competent jurisdiction," which "shall hear and decide such action on an expedited basis."

**Columbus's Unified Development Ordinance**

29.     As specifically contemplated and allowed under the TCA, Section 3.2.72 of Columbus's Unified Development Ordinance (the "Ordinance") regulates the placement of wireless communications facilities in Columbus.  Ordinance Section 3.2.72(C) provides that antennas, towers, and concealed support structures may be either principal or accessory uses, and Ordinance Section 3.2.72(E) expressly allows antennas, towers, and concealed support structures in multifamily residential districts.

30.     The Ordinance specifically allows for and encourages "concealed support structures," which are defined in Section 13.1.1 as "freestanding structure[s] constructed for the primary purpose of supporting one or more antennae but designed to resemble an architectural or natural feature of the specific environment, concealing or camouflaging the presence of the antennae," such as "clock towers, campaniles, water towers, silos, light poles, flagpoles, and artificial trees."

31.     The Property is zoned RMF1 (Residential Multifamily 1), described in Ordinance Section 2.2.11 as a "high density residential zoning district" that also allows "a limited number of commercial uses" as well as "uses that enhance residential areas, such as places of worship, elementary and secondary schools, and parks ...."  Ordinance Sections 3.2.72(I)(2) and Table 3.2.10 and 3.2.11 allow concealed support structures up to 60-feet tall in the RMF1 zoning district.  But T-Mobile's radiofrequency engineers determined that a 60-foot-tall support structure at the Property would not allow T-Mobile to place its antennas high enough to fully remedy its significant coverage gap in this area.

32.     Ordinance Section 2.3.5 establishes the RO (Residential Office) zoning district, "a lower density office and residential zoning district that may be utilized as a transitional buffer

between more intense commercial zoning districts and less dense residential zoning districts." Ordinance Section 3.2.72(I)(2) and Tables 3.2.10 and 3.2.11 allow concealed support structures up to 150-feet tall in the RO zoning district.  T-Mobile's radiofrequency engineers determined that a 150-foot-tall support structure at the Property would allow T-Mobile to place antennas high enough to fully remedy its significant coverage gap in this area.

33.     A 150-foot-tall support structure at the Property would also advance Columbus's goal of encouraging the collocation of multiple antenna facilities on a single tower.  Ordinance Section 3.2.72(G) requires wireless-service providers to collocate their antennas on existing structures, where possible, and Ordinance Section 3.2.72(J) states that "All towers over 100 feet in height shall have structural capacity and ground or interior space to accommodate multiple users. Towers up to 160 feet in height shall accommodate at least three users...."

### Applications for Rezoning and Special Exception Use

34.     Accordingly, on or about July 27, 2021, Municipal filed a Rezoning Application with Columbus to rezone the Property from RMF1 (Residential Multifamily 1) to RO (Residential Office) (the "Rezoning Application") and a Special Exception Use Application to allow a 150-foot-tall concealed support structure on the Property (the "Special Exception Use Application").

35.     In support of the Rezoning Application and the Special Exception Use Application (together, the "Applications"), Municipal submitted, *inter alia,* evidence from T-Mobile demonstrating the need for antennas at the Property.  T-Mobile explained and demonstrated its significant coverage gap in this area, identified its own surrounding towers and antenna facilities, identified other existing structures, and explained why collocation would not

allow it to remedy its coverage gap.  T-Mobile also explained and demonstrated that a 150-foot-tall support structure at the Property would allow it to remedy its significant coverage gap.

36.     Municipal also submitted, *inter alia,* engineering drawings showing the Property, the proposed tower site, and the proposed utility and access easements.  Municipal described and submitted a photograph of the concealed support structure that it proposed—a monopole disguised as a pine tree, commonly called a "monopine tower."  Municipal submitted materials and photographs showing the existing vegetation in the area.  And Municipal submitted photosimulations—superimposing an image of the proposed monopine tower on photographs taken from four vantage points around the Property—showing how the monopine would appear after construction.

37.     Municipal submitted all documents and information required and met all conditions and requirements imposed under the Ordinance to obtain the requested approvals and build the proposed monopine tower at the proposed site on the Property.

38.     Columbus's Planning Department and Planning Advisory Council agreed that Municipal had satisfied all Ordinance requirements to obtain the requested rezoning and special exception use.  The Planning Department staff and the Planning Advisory Council reviewed the Applications and recommended to the Columbus Council that it grant the Applications and approve the requested rezoning and special exception use.

**Council Hearings**

39.     The Rezoning Application (designated RZN-10-21-1930) came before the Columbus Council for a first reading on December 14, 2021.  The agenda for the December 14, 2021, hearing listed and described the Rezoning Application and noted the Planning Department's and Planning Advisory Council's recommendations for approval.  Columbus's

attorney also noted the Planning Department's and Planning Advisory Council's approval recommendations when he introduced the Rezoning Application.

40.     Municipal's attorney, Municipal's CEO, and T-Mobile's radiofrequency engineer all appeared and spoke in favor of the Applications and the proposed monopine tower.  They explained T-Mobile's and other wireless-service providers' need for additional coverage in this area, and they explained that the tower and the carriers' antennas must rise above the surrounding trees to communicate with customers' phones and antenna facilities in adjacent cells.  They explained how reliable wireless coverage is a crucial component of public safety, allowing citizens to place emergency calls and (just as importantly) allowing public-safety officers to locate citizens in distress.

41.     Municipal's representatives also described Municipal's proposed monopine tower, emphasizing and showing its significant improvement over other tree-style support structures.  They presented photosimulations showing what the monopine tower would look like from four different vantage points around the Property.  And they showed an example of Municipal's monopine tower next to the Atlanta Country Club and explained that it had no negative affect on that community or the values of homes there.

42.     In response to Council Members' questions, the Director of Columbus's Planning Department noted the improvement of Municipal's monopine tower over other tree-style support structures and confirmed that Municipal and T-Mobile had presented all required information about surrounding and nearby towers.

43.     Several people spoke in opposition.  Their comments fell into seven general categories.

44.     First, several opposed the tower and antenna facility on the basis of alleged concerns over the effects of radiofrequency emissions.  Under 47 U.S.C. § 332(c)(7)(B)(iv), local governments cannot regulate wireless service facilities "on the basis of the environmental effects of radio frequency emissions" if those facilities "comply with the [Federal Communications Commission's] regulations concerning such emissions."  T-Mobile's and any other carriers' antennas allowed on the monopine tower would comply with FCC regulations concerning radiofrequency emissions.  Therefore, this is not a permissible basis for regulation.

45.     Second, several expressed generalized aesthetic opposition to the proposed monopine tower.  The Ordinance contains specific provisions to address and minimize the aesthetic impact of a wireless towers, including setback requirements (Section 3.2.72(K)(1)), landscaping and screening requirements (Section 3.2.72(K)(2)), and provisions banning facilities on single-family residential properties (Section 3.2.72(E)), encouraging concealed support structures (like Municipal's monopine tower) (Section 3.2.72(K)(3), Table 3.2.10), and encouraging collocation on existing towers (Sections 3.2.10(G) and (J)).  Municipal's proposed monopine tower satisfied all of these provisions.  Generalized aesthetic concerns, without more, are not substantial evidence to support a decision under the TCA.

46.     Third, some expressed concern that the monopine tower would reduce property values in the surrounding area.  Some of those concerns were expressly based on buyers' hypothetical concerns over radiofrequency emissions and are therefore not a valid basis for regulation under 47 U.S.C. § 332(c)(7)(B)(iv).  All of these concerns were unsupported by any evidence or analysis and amounted to nothing more than a restatement of opponents' generalized aesthetic opposition.

47.     Fourth, one opponent questioned what would happen during a tornado.  This is addressed in Municipal's submitted engineering drawings, which state that the tower's design and all site work will comply with all applicable national, state, and local codes.

48.     Fifth, some opponents stated that they had adequate wireless coverage on their telephones.  Some stated that they had wireless service with carriers other than T-Mobile, making their statements irrelevant to T-Mobile's coverage needs.  Even the comments by opponents who claimed to have T-Mobile service do not counter the scientific evidence and call data submitted and described by T-Mobile establishing its substantial gap in coverage.

49.     Sixth, some opponents presented petitions with signatures of area residents opposed to the proposed monopine tower.  The simple fact of a neighbor's opposition to a proposed tower is not substantial evidence to support a decision under the TCA.

50.     And seventh, several opponents argued that the monopine tower would be incompatible with the residential area and should instead be located on a commercially zoned property.  To the extent that this is more than a generalized aesthetic objection, it is directly contradicted by Columbus's legislative policy decision, reflected in Ordinance Section 3.2.72 and Tables 3.2.10 and 3.2.11, that concealed support structures like Municipal's monopine tower are compatible with and are expressly allowed in multifamily residential districts, including the RMF1 district (the Property's current zoning) and the RO district (the proposed zoning).  In any event, none of these opponents offered evidence of any commercially zoned property that was available and suitable for a monopine tower, and none rebutted T-Mobile's showing that other properties further from the designated search ring would not allow T-Mobile's antennas to fill its significant coverage gap in this area.

51.     The Rezoning Application came before the Columbus Council for a second reading on January 11, 2022.  The agenda for the January 11, 2022, hearing listed and described the Rezoning Application and also noted the Planning Department's and Planning Advisory Council's recommendations for approval.  The Special Exception Use Application (designated EXCP-10-21-1931) also came before the Columbus Council on January 11, 2022.  The agenda for the January 11, 2022, hearing listed and described the Special Exception Use Application and also noted the Planning Department's and Planning Advisory Council's recommendations for approval.

52.     When Columbus's attorney reached the Rezoning Application's place on the agenda, he began to introduce it, but before he could even state the application number or the property address, the District 5 Council Member interrupted him with a motion to deny.  The District 10 Council Member seconded the motion, the Mayor called the vote, and the motion to deny was approved.  When Columbus's attorney reached the Special Exception Use Application's place on the agenda, he did not introduce it for action by the Council.  Instead he said the Special Exception Use Application "has been mooted" by the denial of the Rezoning Application.

53.     Municipal complied fully with all applicable procedural and substantive requirements in the Ordinance and satisfied all applicable requirements and conditions precedent to obtain the requested approvals to build and operate a wireless tower and antenna facility at the Property.

54.     T-Mobile's wireless services are "personal wireless services" within the meaning of 47 U.S.C. § 332(c)(7)(C).

55.     Municipal's proposed monopine tower and T-Mobile's proposed antennas and related equipment are "personal wireless service facilities" within the meaning of 47 U.S.C. § 332(c)(7)(C).

56.     Defendants' actions constitute final actions and failures to act within the meaning of 47 U.S.C. § 332(c)(7)(B)(v).

57.     Municipal is a "person adversely affected" by Defendants' final actions and failures to act within the meaning of 47 U.S.C. § 332(c)(7)(B)(v).

58.     Municipal has exhausted all administrative remedies for addressing Defendants' actions.

59.     As a result of Defendants' actions and failures to act, Municipal has been damaged irreparably and has no adequate remedy at law.

## Causes of Action

## Count One

## TCA—Written Decision Supported by Substantial Evidence

60.     Municipal adopts and incorporates herein by reference paragraphs 1 through 59 of this Complaint.

61.     The TCA requires that "Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii).

62.     Defendants' denial of the Rezoning Application constitutes a decision to deny a request to place, construct, or modify personal wireless service facilities within the meaning of 47 U.S.C. § 332(c)(7)(B)(iii).

63.     Defendants' denial of the Special Exception Use Application as moot constitutes a decision to deny a request to place, construct, or modify personal wireless service facilities within the meaning of 47 U.S.C. § 332(c)(7)(B)(iii).

64.     Defendants' denials of the Applications were "final actions" within the meaning of 47 U.S.C. § 332(c)(7)(B)(v).

65.     Defendants' denials of the Applications were not in writing as required under 47 U.S.C. § 332(c)(7)(B)(iii).

66.     Defendants' denials of the Applications were not supported by substantial evidence contained in a written record as required under 47 U.S.C. § 332(c)(7)(B)(iii).

## Count Two

### TCA—Failure To Act Within a Reasonable Period of Time

67.     Municipal adopts and incorporates herein by reference paragraphs 1 through 59 of this Complaint.  Municipal pleads this Count Two in the alternative to Count One.

68.     Under 47 U.S.C. § 332(c)(7)(B)(ii), "A State or local government or instrumentality thereof shall act on any request for authorization to place, construct, or modify personal wireless service facilities within a reasonable period of time after the request is duly filed with such government or instrumentality, taking into account the nature and scope of such request."

69.     The FCC has exercised its rulemaking authority to establish that, with respect to requests for new personal wireless service facilities, 150 day is presumed to be a reasonable period of time for a local government to act on a request within the meaning of 47 U.S.C. § 332(c)(7)(B)(ii).

70.     The Special Exception Use Application is a request for authorization to place and construct personal wireless service facilities within the meaning of 47 U.S.C. § 332(c)(7)(B)(ii).

71.     The denial of the Rezoning Application seeking to rezone the Property from RMF1 to RO did not make the Special Exception Use Application moot because Ordinance Section 3.2.72(I)(2) and Tables 3.2.10 and 3.2.11 allow concealed support structures like Municipal's proposed monopine tower in the RMF1 zoning district.

72.     By scheduling the Special Exception Use Application for action by the Columbus Council on January 11, 2022, and by acceding to that scheduling, Defendants and Municipal mutually agreed to extend the reasonable period of time for Defendants to act on the Special Exception Use Application.

73.     Defendants' failure to consider and decide the Special Exception Use Application on January 11, 2022, constitutes a failure to act on a request to place and construct personal wireless service facilities within a reasonable period of time within the meaning of 47 U.S.C. § 332(c)(7)(B)(ii).

74.     Defendants' failure to consider and decide the Special Exception Use Application on January 11, 2022, constituted a "final action or failure to act" within the meaning of 47 U.S.C. § 332(c)(7)(B)(v).

## Count Three

### TCA—Prohibition of Service

75.     Municipal adopts and incorporates herein by reference paragraphs 1 through 59, 61 through 66, and 68 through 74 of this Complaint.

76.     Under 47 U.S.C. § 332(c)(7)(B)(i)(II), "The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local

government or instrumentality thereof ... shall not prohibit or have the effect of prohibiting the provision of personal wireless services."

77.     Defendants' denial of the Rezoning Application constitutes regulation of the placement of personal wireless service facilities within the meaning of 47 U.S.C. § 332(c)(7)(B)(i)(II).

78.     Defendants' denial of the Special Exception Use Application as moot, or Defendants' failure to act on the Special Exception Use Application within a reasonable period of time, constitutes regulation of the placement of personal wireless service facilities within the meaning of 47 U.S.C. § 332(c)(7)(B)(i)(II).

79.     Defendants' actions were "final action[s] or failure[s] to act" within the meaning of 47 U.S.C. § 332(c)(7)(B)(v).

80.     Defendants' actions prohibit or have the effect of prohibiting the provision of personal wireless services in violation of 47 U.S.C. § 332(c)(7)(B)(i)(II).

**Count Four**

**TCA—Unreasonable Discrimination**

81.     Municipal adopts and incorporates herein by reference paragraphs 1 through 59, 61 through 66, 68 through 74, and 76 through 80 of this Complaint.

82.     Under 47 U.S.C. § 332(c)(7)(B)(i)(I), "The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof ... shall not unreasonably discriminate among providers of functionally equivalent services ...."

83.     Defendants' denial of the Rezoning Application constitutes regulation of the placement of personal wireless service facilities within the meaning of 47 U.S.C. § 332(c)(7)(B)(i)(I).

84.     Defendants' denial of the Special Exception Use Application as moot, or Defendants' failure to act on the Special Exception Use Application within a reasonable period of time, constitutes regulation of the placement of personal wireless service facilities within the meaning of 47 U.S.C. § 332(c)(7)(B)(i)(I).

85.     Upon information and belief, Defendants have allowed other wireless carriers providing functionally equivalent services to T-Mobile's to close significant coverage gaps in their networks.

86.     There is no reasonable basis for the disparate treatment afforded by Defendants to Municipal and T-Mobile, on the one hand, and those other service providers, on the other hand.

87.     Defendants' actions were "final action[s] or failure[s] to act" within the meaning of 47 U.S.C. § 332(c)(7)(B)(v).

88.     Defendants' actions unreasonably discriminate among providers of functionally equivalent services in violation of 47 U.S.C. § 332(c)(7)(B)(i)(I).

**Count Five**

**Due Process**

89.     Municipal adopts and incorporates herein by reference paragraphs 1 through 59, 61 through 66, 68 through 74, 76 through 80, and 82 through 88 of this Complaint.

90.     The United States and Georgia Constitutions prohibit the deprivation of life, liberty, or property without due process of law.

91.     Defendants' actions have no foundation in reason and constitute irrational, arbitrary, and capricious exercises of power having no substantial relation to the public health, safety, morals, or general welfare.

92.     Defendants have violated Municipal's due-process rights guaranteed by the United States and Georgia Constitutions.

**Count Six**

**Equal Protection**

93.     Municipal adopts and incorporates herein by reference paragraphs 1 through 59, 61 through 66, 68 through 74, 76 through 80, 82 through 88, and 90 through 92 of this Complaint.

94.     The United States and Georgia Constitutions guarantee equal protection of the laws.

95.     Upon information and belief, Defendants have allowed other similarly situated property owners, tenants, and applicants to develop their properties to their highest and best uses.

96.     Upon information and belief, Defendants have granted applications to place and construct personal wireless service facilities to similarly situated applicants while denying Municipal's request.

97.     No rational basis exists upon which to base the Defendants' disparate treatment between Municipal and other similarly situated property owners, tenants, and applicants.

98.     Defendants have violated Municipal's right to equal protection of the laws guaranteed by the United States and Georgia Constitutions.

WHEREFORE, Municipal respectfully requests that the Court:

(a)   Grant injunctive relief requiring Defendants to approve the Applications and allow the placement and construction of Municipal's and T-Mobile's proposed monopine tower and antenna facilities at the Property; and

(b)   Grant such other and further relief in favor of Municipal as may be just and proper.

Dated February 10, 2022.

/s/ Scott E. Morris
Scott E. Morris
Georgia Bar No. 004782
Holt Ney Zatcoff & Wasserman, LLP
100 Galleria Parkway, Suite 1800
Atlanta, GA 30339-5960
770-956-9600 (phone)
smorris@hnzw.com

/s/ Roberts S. Poydasheff, Jr.
Robert S. Poydasheff, Jr.
Georgia Bar No. 596593
Poydasheff & Sowers
936 2nd Avenue
Columbus, GA 31901
706-705-5777 (phone)
rpoydasheff@handplaw.com

*Attorneys for Plaintiff*