IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

MUNICIPAL COMMUNICATIONS III,      *
LLC,
                                   *

      Plaintiff,                   *

vs.                                *

                                   *             CASE NO. 4:22-cv-36-CDL
COLUMBUS, GEORGIA; MAYOR OF
COLUMBUS, GEORGIA; and COUNCIL     *
MEMBERS OF COLUMBUS, GEORGIA
and COLUMBUS FORT-BENNING          *
SHRINE CLUB HOLDING COMPANY,
INC.,                              *

      Defendants.                  *

O R D E R

      This action arises from the Defendants' (the "City's")
decision to deny the rezoning requests of Municipal Communications
III, LLC ("Municipal").  The City's approval is necessary for
Municipal to construct a cell tower.  Pursuant to the Federal
Telecommunications Act ("TCA"), Municipal seeks a ruling that
overturns the City's denial of its rezoning requests and mandates
that the City permit the construction of the cell tower.  As the
owner and lessor of the property upon which Municipal seeks to
construct the cell tower, the Columbus Fort-Benning Shrine Club
("Shrine Club") moved to intervene as a party defendant, which the
Court granted.  The Shrine Club claims that Municipal lacks legal
standing because its lease agreement with Municipal is invalid.
Alternatively, the Shrine Club argues that Municipal did not have

authority to seek rezoning of the Shrine Club's entire parcel given that the lease only covers a small portion of the Shrine Club's property.

Presently pending before the Court are the parties' cross-motions for summary judgment. For the reasons below, the Court finds as follows: (1) the Shrine Club's motion for summary judgment (ECF No. 27) is denied; (2) Municipal's motion for summary judgment relating to its legal standing (ECF No. 28) is granted; (3) the City's motion for summary judgment (ECF No. 24) is granted; and (4) Municipal's motion for summary judgment as to its TCA claim (ECF No. 29) is denied. The motion to strike pending at ECF No. 46 is denied as moot.

SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a *genuine* dispute of *material* fact exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing summary judgment, drawing all justifiable inferences in the opposing party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A fact is *material* if it is relevant or necessary to the outcome of the suit. *Id.* at 248. A factual dispute is *genuine* if

the evidence would allow a reasonable jury to return a verdict for the nonmoving party. *Id.*

FACTUAL BACKGROUND

Municipal acquires rights to properties to build towers and support structures on behalf of wireless carriers. It agreed to secure the proper governmental approvals for a new cell tower in Columbus, Georgia on behalf of T-Mobile.

Municipal proposed a new 150-foot cell tower at a property—owned by the Shrine Club—located in a neighborhood that is zoned as "Residential Multifamily 1" ("RMF1"). The maximum tower height in areas zoned RMF1 is 60 feet. Because T-Mobile's engineers had determined that a cell tower with a height of 150 feet was necessary to close a "significant coverage gap" in the area, Municipal applied to rezone the property to Residential Office ("RO")—which would permit the construction of a 150-foot tower. Because cell towers are only permitted in RO zoning districts under a special exception, Municipal also filed a Special Exception Use Application. Municipal claims that the Shrine Club property is the only suitable and available property that would allow T-Mobile to serve the coverage gap in the area. It asserts that no existing towers or structures can support the coverage gap given the area's dense population and high traffic.

After Municipal filed its rezoning applications, Councilor Charmaine Crabb—the City Council member serving the area—received

multiple emails from constituents opposed to the proposed rezoning and cell tower, including from a representative of the Shrine Club, Larry Whisnant. In the email, Whisnant claimed that the rezoning would detract from the "current zoning and value" and raised the issue of the validity of the lease between the Shrine Club and Municipal. Crabb Decl. Ex. A, Email from Larry Whisnant to Councilor Charmaine Crabb 1 (Oct. 26, 2021), ECF No. 26-1 at 48. Councilor Crabb subsequently informed Municipal's attorney that she did not support the rezoning due to the amount of opposition it had generated from her constituents. Crabb added that she did not oppose cell towers in general; she just opposed a cell tower being built at this specific location given that the owner of the property opposed it. She pointed out that there were already two existing cell towers within two miles of the property.

In accordance with the prescribed process for zoning changes, the City's Planning Department conducted a review of Municipal's applications. The Planning Department recommended approval, concluding that Municipal's requests were "compatible with existing land uses" so long as the Shrine Club property could only be used as a club or lodge, a banquet facility, and a wireless communications facility. Corry Decl. Ex. B, Council Staff Report 1-2, ECF No. 29-21 at 3-4. The report disclosed that the City Council had previously denied a similar request made by Municipal

to rezone the Shrine Club property in 2018. *Id.* at 3, ECF No. 29-21 at 5.

The City's Planning Advisory Commission ("PAC") held a public meeting to address Municipal's applications. Two representatives spoke in support of the applications on behalf of Municipal and answered questions from the PAC. At least seven individuals spoke in opposition. Those individuals voiced a variety of objections to the proposed rezoning and cell tower, including concerns about health, property value loss, and the height of the tower compared with the height of surrounding trees and houses. Davis Decl. Ex. A, Planning Advisory Commission Meeting Minutes CCG00129, ECF No. 25-1 at 130. Others stated that there was no need for a new cell tower because they had never experienced connection problems with cell service or Wi-Fi. *Id.* Whisnant, the trustee for the property at issue, appeared on behalf of the Shrine Club to voice his opposition to the rezoning. He claimed that the rezoning would jeopardize the Shrine Club's nonprofit status. *Id.* at CCG00128, ECF No. 25-1 at 129. At the conclusion of the meeting, the PAC voted unanimously to recommend approval of Municipal's applications.

Municipal's applications then came before the Columbus City Council for a public hearing. Two representatives from Municipal (its attorney and its CEO) and one from T-Mobile (a radiofrequency engineer) spoke in favor of the applications. Municipal's

representatives explained the need for additional coverage for the area as evidenced by dropped-call data. They explained that adequate wireless coverage was a public safety issue given that 5,400 911 calls were made on T-Mobile's network alone in the coverage area each year and filling gaps would help ensure that emergency responders could locate callers. City Council Meeting Transcript 7:15-21, ECF No. 29-29. Municipal's attorney shared that he lived in the coverage area and could attest that his home had poor cell service and that he had been put at risk in the past given that his alarm system was linked to the cellular network. *Id.* at 2:16-3:11. Municipal's representatives added that the Shrine Club location posed the least visual impact for the cell tower and showed photo simulations estimating the tower's visual impact, which in Municipal's view, would be minimal given its monopine (pine tree-like) design. Corry Decl. Ex. C, Documents Displayed During December Council Meeting 2-3, ECF No. 29-22 at 3-4. Municipal also showed a comparison image from a similar monopine tower already built in an Atlanta community and explained that there had been no impact on home values in the community due to the tower. *Id.* at 1, ECF No. 29-22 at 2.

Ten neighbors spoke in opposition. They objected to the proposed rezoning and cell tower on a variety of grounds. For example, at least three neighbors raised concerns about the negative impact the cell tower would have on property values. City

Council Meeting Transcript 33:17–18, 36:12–13. One neighbor supported his concerns about property values with articles and surveys indicating that cell towers had a depressive effect on home values because of cell towers' displeasing aesthetic appearance and potentially adverse health effects. *Id.* at 21:6–22:6. This concerned neighbor added that he believed Municipal's photo simulations misrepresented how aesthetically invasive the cell tower would be, explaining that based on other cell towers in the area, it would be "visible for nearly a mile circumference around." *Id.* at 23:19–24:5. Other neighbors expressed similar concerns regarding the height and appearance of the cell tower which they found incompatible with the residential character of the neighborhood. *Id.* at 29:21–24, 31:11–15, 32:10–33:4, 36:18–37:10, 38:6–14.

Neighbors who were concerned about this incompatibility, *id.* at 26:2–28:3, also worried that rezoning the property from RMF1 to RO would open the door to future commercial development. *Id.* at 25:10–14, 28:4–7, 35:21–23. Another neighbor voiced his concern about the safety of the tower in light of the residential surroundings; he speculated that equipment attached to the tower could be dislodged during a tornado. *Id.* at 39:12–18. More neighbors expressed skepticism about the need for a new cell tower based on their own experience of never noticing any coverage gaps.

*Id.* at 31:2–6.  Finally, a representative from the Shrine Club contested Municipal's right to use the property.  *Id.* at 33:9–20.

City Council members made comments and asked questions throughout the meeting, including inquiring as to whether any existing towers in the area could support the coverage gap and what had changed since the Council denied Municipal's previous application in 2018.  *Id.* at 12:13–14:2, 14:13–15:2, 18:6–15.  The Council did not vote on Municipal's applications at the meeting; it indicated that the vote would be held the next month, on January 11, 2022.  After the City Council meeting but before the January vote, Municipal submitted a letter for the Council's consideration.  In its letter, Municipal reiterated the need for a new cell tower in the area based on the area's dense population, car traffic, and dropped-call data.  It reminded the City that no viable commercially zoned properties were located within the quarter-mile search area and that the Council had granted what Municipal believed to be similar cell tower applications in the past.

Municipal also responded to comments that members of the public had made in opposition to its application at the Council meeting.  Regarding the public's objections to the tower based on aesthetics, Municipal contended that the monopine design of its proposed tower adequately minimized its visual impact.  In response to the contentions about decreased property values, it countered

that poor wireless service also detracts from home values and that similar monopine towers had not affected home prices in neighborhoods with higher median home prices. It also denied one neighbor's claim that its photo simulations were "photoshopped" and reminded the City that concerns about the health effects of radiofrequency emissions from cell towers could not be considered under the TCA. The City Attorney confirmed receipt of the memorandum and distributed it to each Council member prior to the vote.

At the January 11 meeting, Council Member Crabb made a motion to deny Municipal's Rezoning Application, which was seconded. The Council unanimously denied the Rezoning Application. There was no discussion or reasons given for the denial at that time. The Special Exception Use Application was declared moot in light of the denial of the Rezoning Application.

Municipal filed its lawsuit on February 10, 2022 in accordance with the TCA's 30-day deadline. It claimed that the City's denial of its applications was not in writing or supported by substantial evidence as required under the TCA. Thirteen days after Municipal filed this lawsuit, Columbus's Mayor sent a letter to Municipal stating that the City Council had denied Municipal's applications "based on the entire record, including, but not limited to" the applications, the Planning Department's report, and the PAC and City Council meetings. Corry Decl. Ex. G, Letter from Mayor B.H.

("Skip") Henderson to Robert S. Poydasheff, Jr. 2, ECF No. 29-26 at 3.  The letter added that the Council had rejected a similar application made by Municipal in 2018 and that substantial evidence existed that the proposed tower would present "negative aesthetic, safety[,] and property value issues."  *Id.*  It also alleged that the tower would negatively impact the usability of nearby property and that Municipal had failed to consider non-residential sites for the tower.  *Id.*

DISCUSSION

Four motions for summary judgment are currently pending before the Court: two from Municipal, one from the City, and one from the Shrine Club.  The motions relate to two distinct issues. The first set of motions were brought by the Shrine Club and Municipal.  The Shrine Club argues that Municipal lacks standing because the lease only covers a portion of the property that Municipal seeks to rezone and because the lease is otherwise invalid and unenforceable.  The second set of motions, brought by the City and Municipal, address the merits of Municipal's TCA claim.  They relate to whether the City failed to comply with the TCA's timing requirement for providing the reasons for denial in writing and whether the City adequately supported its denial under the substantial evidence standard.  Given that the motions relating to the lease agreement touch on threshold questions of legal

standing, the Court will address them first.  The Court will then address the motions relating to Municipal's TCA claim.[1]

## I.    Standing

Both Municipal and the Shrine Club move for summary judgment on the issue of whether Municipal has standing to sue under Article III of the Constitution and under the TCA.  According to Supreme Court precedent, constitutional standing is rooted in Article III of the United States Constitution, which authorizes federal courts to hear and decide certain classes of cases and controversies.  U.S. Const. art. III, § 2.  To demonstrate that it has standing, Municipal must establish that it has suffered an injury in fact, that the injury was caused by the City's conduct, and that its injury can likely be redressed by its requested judicial relief—an injunction ordering the City to approve its rezoning requests. *See FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024). As a preliminary matter, no party seriously disputes that Municipal has suffered a cognizable injury in fact given that it could not build the cell tower it desired.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992) (stating that when a plaintiff is the

---

[1] The Court has been sensitive to the public policy as expressed in the TCA that these actions should be decided expeditiously.  And upon superficial examination, one could conclude that this action, which was first filed on February 10, 2022, has not been expedited.  A closer look reveals, however, that this action has involved a significant collateral matter involving the Shrine Club's motion to intervene and that counsel for the parties have sought and been granted stays of this action as well as extensions for briefing.  The present motions have actually only been ripe since March 25, 2024.

object of government action, "there is ordinarily little question
that the action or inaction has caused him injury"). That injury
was fairly traceable to the City because the City denied
Municipal's zoning applications and thus prevented Municipal from
building its proposed cell tower. The dispute centers on whether
this Court can redress Municipal's injury. Municipal and the
Shrine Club acknowledge that the redressability issue hinges on
both the validity of the lease agreement between the two and
whether Municipal has the authority under the lease to seek a
rezoning of the Shrine Club's property. Absent a valid agreement
or authority under the lease, Municipal's requested relief would
not be redressable given that, without the Shrine Club's consent,
Municipal would not have a right to use the Shrine Club's land to
build its cell tower. The Court begins with the Shrine Club's
arguments that the lease is invalid before proceeding to its
argument that the lease does not grant Municipal the authority to
rezone the Shrine Club's land.

A.  Does the Purported Lease Between Municipal and the
    Shrine Club Lack Mutuality?

The Shrine Club first argues that the lease agreement between
it and Municipal is invalid because the lease lacks mutuality of
obligation. That is, the Shrine Club contends that the lease is
not valid because Municipal has no obligation under the lease until
it builds its cell tower. Municipal argues that the lease

possesses mutuality because Municipal does have obligations prior to the actual construction of the cell tower, such as purchasing insurance and diligently pursuing the government authorizations necessary for construction of the cell tower. It represents that it has been complying with those obligations in good faith.

Under Georgia law, the "supposed requirement of mutuality of obligation is merely one of mutuality of consideration." *Jackson Elec. Membership Corp. v. Ga. Power Co.*, 364 S.E.2d 556, 558 n.2 (Ga. 1988) (citation omitted). Accordingly, the Court recognizes the Shrine Club's argument regarding lack of mutuality as an argument that the contract between it and Municipal lacked consideration. In circumstances where no independent consideration exists—the case here—mutually interdependent promises binding the parties suffice as consideration. *Brack v. Brownlee*, 273 S.E.2d 390, 391 (Ga. 1980). As the Shrine Club acknowledges, the parties agreed to perform on mutually interdependent promises. Municipal agreed to pursue the construction of a cell tower on a portion of the Shrine Club's property and pay the Shrine Club rent for use of that portion of the property. In exchange, the Shrine Club agreed to allow Municipal to use its land for the cell tower during the term of the lease. The Shrine Club also agreed to "use its best efforts to cooperate with [Municipal] in obtaining all licenses, permits[,] or authorizations" required for Municipal's

contemplated use of the premises and to "join" Municipal in any required applications or permits. Corry Decl. Ex. A, Lease Agreement § 2, ECF No. 28-4. The Court finds that these promises suffice under Georgia law.

The Shrine Club argues that the terms of the contract are unenforceable because they do not explicitly obligate Municipal to build a cell tower. Under the Shrine Club's interpretation, Municipal could, in theory, rezone the Shrine Club's entire parcel and then opt not to build a cell tower, thus leaving the Shrine Club's property with an undesired zoning classification and no rent payments to show for it. But the Shrine Club's theory ignores that Municipal is bound by an implied duty of good faith to carry out implied contingencies under the contract. *Cf. Brack*, 273 S.E.2d at 391 (explaining that a real estate contract that was conditioned on securing a loan was not unenforceable due to lack of mutuality because the purchaser had an implied duty to seek to have the financing contingency take place). The contract clearly expressed Municipal's intention to build a cell tower on the Shrine Club's property. It also contemplated that government approvals may need to be secured prior to construction. Within thirty days of Municipal's completion of the cell tower, Municipal would begin paying rent to the Shrine Club for use of the property. Therefore, the requirement that Municipal secure the necessary approvals for construction of a cell tower is an implied condition precedent to

14

the parties' performance under the contract. *See Jackson Elec. Membership Corp.*, 364 S.E.2d at 557 (finding that the requirement that a contracting party be accepted into the other contracting party's membership was an implied condition precedent to immediate performance even though the contract only implicitly mentioned the membership requirement). Municipal was thus bound by an implied duty of good faith to make best efforts to secure the necessary zoning approvals. The Shrine Club has not pointed to any evidence in the record suggesting that Municipal has not been diligently pursuing its obligation to secure those approvals or that its promises were otherwise illusory. Rather, the record is replete with evidence that Municipal has made significant efforts in pursuit of its obligations. Indeed, securing the necessary zoning approvals is the very purpose of this litigation.[2] Accordingly, the Court finds that Municipal's contract with the Shrine Club did not lack mutuality.

---

[2] The Shrine Club also argues that the lease lacks mutuality because it contains a unilateral termination provision, which allows Municipal (but not the Shrine Club) to terminate the lease "for any reason immediately upon written notice." Lease Agreement § 11. In support of this assertion, the Shrine Club cites *Pabian Outdoor-Aiken, Inc. v. Dockery*, where the Georgia Court of Appeals held that a contract which contained a unilateral termination provision which only benefitted the lessee lacked mutuality but "only to the extent that [the lessee's] consideration was its illusory promise to remain in the lease and pay rent." 560 S.E.2d 280, 282 (Ga. Ct. App. 2002). But as the Court concluded above, the Shrine Club did not point to evidence that Municipal's promises were illusory. And in any event, the Shrine Club failed to articulate how the termination provision is implicated in this action.

B.   Does the Rule Against Perpetuities Apply?

The next issue before the Court is whether the contract between the Shrine Club and Municipal is a lease, as Municipal argues, or an option to lease, as the Shrine Club argues.   The Shrine Club contends that if the contract is an option to lease, then it is void under Georgia's rule against perpetuities.   If, as Municipal argues, the contract is a lease, then it is not subject to the rule.  *St. Regis Paper Co. v. Brown*, 276 S.E.2d 24, 26 (Ga. 1981).

"The cardinal rule of construction is to ascertain the intention of the parties. If that intention is clear and it contravenes no rule of law and sufficient words are used to arrive at the intention, it shall be enforced irrespective of all technical or arbitrary rules of construction." O.C.G.A. § 13-2-3.  By its plain terms, the contract evinces the parties' intent to enter a lease.  The document is titled "Lease Agreement" and refers to the subject property as the "Leased Premises."  *See generally* Lease Agreement (referring to the subject property as the "Leased Premises" throughout).  It also establishes an initial lease term and successive renewal terms.  *Id.* § 3.  The initial term of the lease commences on the effective date of the lease—March 12, 2014—and continues for five years following the "Rent Commencement Date," which itself begins thirty days after the construction of a cell tower on the leased premises.  *Id.*

Municipal is not obligated to pay rent until the "Rent Commencement Date." *Id.* § 4.  Following the "Rent Commencement Date," Municipal must pay a monthly fee to the Shrine Club and has a right to renew the lease for nine additional five-year terms.  *Id.* § 3.  Accordingly, the Court finds that the Shrine Club's agreement with Municipal is properly interpreted as a lease.

The Shrine Club argues that while the document claims to be a lease, it is really an option to lease given that Municipal is not obligated to pay rent until thirty days following the completion of its cell tower.  The Court acknowledges that delaying the accrual of rent payments may have the unintended consequence of reducing Municipal's incentive to complete the cell tower in a timely manner.  In theory, this could create a perpetuity.  But even assuming that the rule applies, the Shrine Club did not point to any language in the agreement or any other evidence that the parties intended to create such a perpetuity.  *See Smith v. Stuckey*, 503 S.E.2d 284, 287 (Ga. Ct. App. 1998) (finding that the rule of perpetuities did not apply to an option agreement because the agreement's language did not evidence an intent to create a perpetuity or purport to establish a time period for the exercise of the options).  And indeed, as the Court stated above, there is no evidence in the record indicating that Municipal was not diligently pursuing its implied duty to perform its promises under

the lease in good faith.  Accordingly, the Court finds that the lease agreement is not void under the rule against perpetuities.

C.    Does the Lease Empower Municipal to Rezone the Shrine Club's Entire Parcel?

The Shrine Club argues that even if its lease agreement with Municipal is valid, the agreement does not authorize Municipal to rezone the entire property given that the lease only covers a portion of the Shrine Club's larger parcel.  It points to the lease's zoning provision, which provides:

> Landlord represents and warrants that *there is no zoning restriction that would prohibit the contemplated installation, occupancy, and use* as provided in this Lease. Tenant shall be responsible for verifying with all appropriate county or governmental authorities[] compliance with any zoning requirements or limitations for the Tenant Improvements and all permits required for the Tenant Improvements.

Lease Agreement § 12.06 (emphasis added).  The Shrine Club argues that its representation that there was no zoning restriction that would prohibit the construction of the cell tower indicates that the parties only contemplated a cell tower 60 feet tall, which would not require a rezoning.  Thus, according to the Shrine Club, rezoning the entire property was outside the scope of the lease.

The Court disagrees.  The lease provides that "It is [Municipal's] intent . . . to construct . . . a wireless communications tower."  *Id.* § 2.  The same clause goes on to state that Municipal may construct "any and all incidental facilities, structures and improvements, including without limitation, tower

and base, antennas, microwave dishes, equipment shelters, cables
and utility lines and related equipment, on the Leased Premises
necessary for [Municipal's] use during the term of this Lease."
*Id.* This language does not suggest any limitation—height or
otherwise—prohibiting the construction of a 150-foot cell tower.
The lease provides that Municipal shall own the cell tower during
the lease term and have the right to "alter, replace, expand,
enhance[,] and upgrade" it. *Id.* These provisions suggest that
the parties conferred wide discretion on Municipal as to the
facilities, structures, and improvements that would be necessary
to accomplish Municipal's contemplated use of the leased premises.

The Court also observes that the Shrine Club agreed to work
with Municipal to accomplish the purpose of the agreement.
Notably, the lease requires the Shrine Club to "use its best
efforts to cooperate with [Municipal] in obtaining all licenses,
permits or authorizations that may be required for [Municipal's]
use of the Leased Premises from all governmental and/or regulatory
entities and authorities." *Id.* The Shrine Club further agreed to
"execute any necessary documents or, as may be required,
simultaneously join [Municipal] in any applications or permits,
that may be required." *Id.* This language means what it says—that
the Shrine Club agreed to cooperate with Municipal in obtaining
any government authorizations required for the construction of a
cell tower on the leased premises. Although the Court acknowledges

that the Shrine Club's representation that there were no zoning restrictions that would prevent Municipal's contemplated use could be deemed inconsistent with the approval of a 150-foot cell tower, the Court finds the affirmative promises that the Shrine Club made in the lease agreement clear.    And when the language of the contract is clear, the Court enforces the contract's terms as written.  *Healthy-IT, LLC v. Agrawal*, 808 S.E.2d 876, 882 (Ga. Ct. App. 2017).  Accordingly, the Court finds that the lease authorized Municipal to seek rezoning of the Shrine Club's larger parcel.

### D.  Does Municipal Possess Standing to Sue?

The   Court   next   turns   to   whether   Municipal   meets constitutional and statutory standing requirements.  As the Court previously noted, the only element seriously in dispute is whether this Court can redress Municipal's injuries with a favorable decision.   Having decided that Municipal's lease agreement was valid and enforceable and that the lease authorized Municipal to seek rezoning of the Shrine Club's property, the Court is satisfied that  Municipal's  requested  relief  is  sufficiently  likely  to redress its injuries under constitutional standards.

Municipal  also  satisfies  statutory  standing  requirements under  the  federal  Telecommunications  Act.   The  TCA's  standing provision states:

> Any person adversely affected by any final action or
> failure to act by a State or local government or any
> instrumentality thereof that is inconsistent with this

> subparagraph may, within 30 days after such action or
> failure to act, commence an action in any court of
> competent jurisdiction.

47 U.S.C. § 332(c)(7)(B)(v). The TCA defines "person" as including "individual[s], partnership[s], association[s], joint-stock company[s], trust[s], or corporation[s]." 47 U.S.C. § 153(39). Municipal plainly falls within this broad definition of "person." Further, Municipal has been adversely affected by the City Council's denial of its zoning requests because the denial prohibited it from building its proposed cell tower. Accordingly, the Court is satisfied that Municipal has standing pursuant to the TCA.[3]

In sum, the Court finds that Municipal's lease agreement with the Shrine Club is valid and that the lease authorized Municipal to seek to rezone the Shrine Club's property. Accordingly, Municipal has legal standing pursuant to Article III and the TCA. Municipal's motion for summary judgment (ECF No. 28) is accordingly granted on this issue. The Shrine Club's motion (ECF No. 27) is denied.

---

[3] The Court finds the Shrine Club's reliance upon *Stuttering Foundation, Inc. v. Glynn County*, 801 S.E.2d 793, 799 (Ga. 2017), unpersuasive given the federal interests at stake under the TCA. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 262 n.8 (1977). Having satisfied federal constitutional and statutory standing requirements, Municipal cannot be thwarted from seeking redress for the alleged violation of its federal rights by state or local *standing* law that would have the effect of trumping federal standing requirements.

## II.  Telecommunications Act Claim

The Court next considers the motions related to Municipal's claim that the City violated the TCA when it denied Municipal's rezoning applications.  The TCA requires that decisions by state and local governments to deny requests to place, construct, or modify cell phone towers "be in writing and supported by substantial evidence contained in a written record."  47 U.S.C. § 332(c)(7)(B)(iii).  The Supreme Court has interpreted the TCA to require localities to provide their written reasons for denial "at essentially the same time" as the denial is communicated.  *T-Mobile S., LLC v. City of Roswell*, 574 U.S. 293, 304 (2015).  Municipal claims that the City did not comply with the TCA when it denied Municipal's request to build a cell phone tower because the City did not state the reasons for denial in writing contemporaneously with its decision to deny and did not support its decision with substantial evidence.  Municipal and the City filed cross-motions for summary judgment addressing Municipal's TCA claim and the City's defenses.  The City does not seriously dispute that it failed to comply with the TCA when it delayed providing Municipal with the reasons for its denial until thirteen days after Municipal filed its lawsuit.  The remaining issues are whether this delay constituted harmless error, and if so, whether the City's denial was supported by substantial evidence.  The Court addresses each issue in turn.

A.    Was the City's Failure to Comply with the TCA's Timing Requirement Harmless Error?

The City argues that this Court should excuse its delay in providing Municipal with the reasons for its denial because the minor delay was harmless.  The party attacking the agency's determination bears the burden of showing that the asserted error is harmful. *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009). Accordingly, Municipal must demonstrate some harm caused by the City's delay in providing the reasons for its denial of Municipal's request to build a cell phone tower.  In *T-Mobile South*, the Supreme Court explained that the TCA's timing requirement was designed to prevent potential harms such as leaving entities like Municipal "to guess" a locality's reasons for denial when considering whether to seek judicial review and also to prevent stymying judicial review itself.  574 U.S. at 304 & n.3.

Here, the Court finds that Municipal failed to articulate how it was harmed by the City's tardiness in complying with the TCA's timing requirement.  Although Municipal argues that allowing City to offer reasons for the denial after the filing of the lawsuit is incompatible with and stymies orderly judicial review, Municipal did not explain how the judicial review process has been negatively impacted by the delay.  Municipal also did not demonstrate that the delay prevented it from making a "considered decision whether to seek judicial review;" that the delay rendered

Municipal unable to make certain arguments or present certain evidence; or that the lack of a delay would have resulted in a different outcome. *T-Mobile S.*, 574 U.S. at 304. Put simply, Municipal did not point to evidence of any harm it suffered because of the City's delay in providing the reasons for its denial. Accordingly, the Court finds that the City's failure to comply with the TCA's timing requirement constituted harmless error. The City's motion for summary judgment is granted on this ground.

B.  Were the City's Reasons for Denial Supported by Substantial Evidence?

Having decided that the City's delay was harmless, the next issue to be decided is whether the City's denial of Municipal's request was supported by substantial evidence. As the party challenging the locality's decision under the TCA, Municipal has the burden to prove that the decision was not supported by substantial evidence. *Am. Tower LP v. City of Huntsville*, 295 F.3d 1203, 1207 (11th Cir. 2002). "Substantial evidence" within the meaning of the TCA is "the traditional standard used for judicial review of agency actions." *Preferred Sites, LLC v. Troup Cnty.*, 296 F.3d 1210, 1218 (11th Cir. 2002) (internal quotation omitted). "Substantial evidence" means "such relevant evidence [that] a reasonable mind might accept as adequate to support a conclusion." *Id.* The standard means "more than a mere scintilla but less than a preponderance" of evidence. *Am. Tower LP*, 295

F.3d at 1207 (quoting *360° Commc'ns Co. v. Bd. of Supervisors*, 211 F.3d 79, 83 (4th Cir. 2000)).    In determining whether the substantial evidence standard is met, "a court should view the record in its entirety, including evidence unfavorable to the state or local government's decision." *Preferred Sites*, 296 F.3d at 1218.    While "[a] court cannot substitute its own judgment" for that of the locality, "it must overturn the [locality's] decision if the decision is not supported by substantial evidence." *Id.* at 1218–19.    "[T]he TCA's requirement that local decisions be supported by substantial evidence 'does not "affect or encroach upon the substantive standards to be applied under established principles of state and local law."'"    *Id.* at 1219 (quoting *Cellular Tel. Co. v. Town of Oyster Bay*, 166 F.3d 490, 494 (2d Cir. 1999)).

The Court finds that substantial evidence existed to support the City's denial of the proposed rezoning based on the cell tower's incompatibility with its residential surroundings. Specifically, the Court concludes that the photo simulations and the extensive public opposition voiced at the PAC and City Council meetings supported the City's determination that a legitimate factual basis existed for the denial of Municipal's rezoning requests.[4]    Municipal argues that this evidence amounts to

---

[4] The Court reaches this finding irrespective of the public objections based on the potentially deleterious effects of radiofrequency

"generalized aesthetic concerns" and is thus insufficient to constitute substantial evidence.  The Court disagrees.  The City was well within its discretion under the local ordinance in denying the application based on the record evidence given that the 150-foot cell tower would be significantly taller than the existing tree line, would be incompatible with the existing uses of the Shrine Club's property and the properties adjacent to it, and otherwise would not be cohesive with the residential character of the area.  *See* Columbus, Ga., Unified Development Ordinance § 3.2.72(G) (2024) (explaining that when reviewing a cell tower application, factors such as height, proximity to residential uses, and visual obtrusiveness "shall" be considered); *id.* § 10.2.7 (stating that the Council "shall" consider factors such as whether the proposed use is consistent with the purpose of the zoning district, suitable in light of the zoning and development of nearby properties, and whether it will adversely affect the existing use of nearby properties).  This Court cannot displace the City Council's "fair estimate of conflicting evidence" with its own judgment.  *Am. Tower LP*, 295 F.3d at 1209 n.8.  Accordingly, the City's motion for summary judgment (ECF No. 24) is granted.

---

emissions.  Substantial evidence existed to support the City's denial without taking into account those comments.  *See* 47 U.S.C. § 332(c)(7)(B)(iv) (prohibiting localities from taking into account the environmental effects of radio frequency emissions when regulating the placement of wireless facilities to the extent that the facility would comply with FCC regulations).

Municipal's motion for summary judgment as to its TCA claim (ECF No. 29) is denied.

CONCLUSION

For the foregoing reasons, the Court finds as follows: (1) the Shrine Club's motion for summary judgment (ECF No. 27) is denied; (2) Municipal's motion for summary judgment relating to its legal standing (ECF No. 28) is granted; (3) the City's motion for summary judgment (ECF No. 24) is granted; and (4) Municipal's motion for summary judgment as to its TCA claim (ECF No. 29) is denied.  The motion to strike pending at ECF No. 46 is denied as moot.  With nothing remaining to be decided by this Court, final judgment shall be entered accordingly.


IT IS SO ORDERED, this 1st day of July, 2024.

S/Clay D. Land
CLAY D. LAND
U.S. DISTRICT COURT JUDGE
MIDDLE DISTRICT OF GEORGIA